O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

INLAND EMPIRE WATERKEEPER, a   )   Case No. ED CV 07-00480 DDP (FMOx)
chapter of ORANGE COUNTY       )
COASTKEEPER, a non-profit      )   **ORDER GRANTING MOTION FOR PARTIAL**
corporation,                   )   **SUMMARY JUDGMENT**
                               )
                Plaintiff,     )   [Motion filed on March 18, 2008]
                               )
        v.                     )
                               )
UNIWEB, INC., a California      )
corporation,                   )
                               )
                Defendants.    )
_____)

     This matter is before the Court on Plaintiff Inland Empire

Waterkeeper's Motion for Partial Summary Judgment.  After reviewing

the papers submitted by the parties and considering the arguments

therein, the Court grants the motion.

I.   BACKGROUND

     This case arises out from Defendant Uniweb, Inc.'s ("Uniweb")

alleged violation of the Federal Water Pollution Control Act

("Clean Water Act" or "Act"), 33 U.S.C. § 1365.  Plaintiff Inland

Empire Waterkeeper, a chapter of the nonprofit organization Orange

1  County Coastkeeper, filed this citizen suit against Uniweb as one

2  of several related cases against industrial users that release

3  wastewater into the City of Corona's Publicly Owned Treatment Works

4  ("POTW").  Plaintiff alleges that Uniweb has exceeded the

5  wastewater discharge limits under its permit with the City of

6  Corona in violation of the Clean Water Act.  Plaintiff seeks

7  partial summary judgment that Uniweb violated the Act and a

8  determination of the number of violations.

9       A.   Statutory Background on the Clean Water Act

10      Section 301(a) of the Clean Water Act prohibits the discharge

11 of pollutants into navigable waters unless in compliance with the

12 Act.  Congress directed the Environment Protection Agency ("EPA")

13 to promulgate regulations setting limits on the pollutant

14 discharges from three general types of "point sources," 33 U.S.C. §

15 1362(14) (1976), including (1) point sources discharging directly

16 into navigable waters ("direct dischargers"); (2) POTWs treating

17 municipal sewage or industrial wastewater; and (3) point sources

18 discharging pollutants into POTWs rather than directly into

19 navigable waters ("indirect dischargers").  See Nat'l Ass'n of

20 Metal Finishers v. EPA, 719 F.2d 624, 633 (3rd Cir. 1983), rev'd on

21 other grounds, Chemical Mfrs. Ass'n v. Natural Resources Defense

22 Council, Inc., 470 U.S. 116 (1985).  Direct dischargers and POTWs

23 are regulated through the National Pollutant Discharge Elimination

24 System ("NPDES") permit issued to the discharger under section 402

25 of the Act.  Indirect dischargers are regulated under separate

26 regulatory standards provided for by section 307(b)(1) of the Act,

27 33 U.S.C. § 1317(b).  Id.

28

1    Congress sought to regulate indirect dischargers in
2    recognition that "the pollutants which some indirect dischargers
3    release into POTWs could interfere with the operation of the POTWs,
4    or could pass through the POTWs without adequate treatment."  Nat'l
5    Ass'n of Metal Finishers, 719 F.2d at 633.  The EPA has promulgated
6    two types of national pretreatment standards applicable to indirect
7    dischargers: general pretreatment regulations and national
8    categorical pretreatment standards.  "It is unlawful for any
9    indirect discharger to operate in violation of any 'effluent
10   standard or prohibition or pretreatment standard' promulgated under
11   section 307.'"  Id., quoting 33 U.S.C. § 1317(d).

12   40 C.F.R. 403 sets forth the permitting requirements for
13   "industrial users" that release pollutants into POTWs.[1]  All POTWs
14   discharging over 5 million gallons per day ("GPD") and receiving
15   pollutants from industrial users must develop a pretreatment
16   program.  40 C.F.R. § 403.8.  A POTW must issue individual permits
17   to all "Significant Industrial User[s]," which includes those
18   industrial users (1) subject to the categorical pretreatment
19   standards; (2) discharging more than 25,000 GPD; or (3) determined
20   to be significant by the POTW based upon "a reasonable potential
21   for adversely affecting the POTW's operation or for violating any
22   [p]retreatment [s]tandard or requirement."  40 C.F.R. §§ 403.8(f);
23   403.3(v)(1)(ii).  Individual pretreatment permits "must be
24   enforceable."  The permits must establish effluent limits, as well
25   as self-monitoring, sampling, reporting, notification and
26   recordkeeping requirements.  40 C.F.R. § 403.8(f)(1).

27   _____

28   [1]By definition, "[the] term Industrial User or User means a
     source of Indirect Discharge."  40 C.F.R. § 403.3(j)

POTWs are also required to set local standards: "where pollutants contributed by User(s) result in Interference or Pass-Through, and such violation is likely to recur, [POTWS must] develop and enforce specific effluent limits for Industrial User(s), and all other users, as appropriate. . . ."  40 C.F.R. 403.5(c)(2).  "[S]uch [local] limits shall be deemed [enforceable] Pretreatment Standards for the purposes of section 307(d) of the Act."  40 C.F.R. § 403.5(d).  Local limits may be more stringent than federal pretreatment standards. 40 C.F.R. § 403.4.

B.   Factual Background

1.   The City of Corona's Pretreatment Program

The City of Corona's pretreatment ordinance, adopted pursuant to 40 C.F.R. 403 and set forth under section 13.08 of the Corona Municipal Code, provides local prohibitions, discharge limits, and reporting and permitting requirements.  The Regional Water Quality Board, which is the "Approval Authority" delegated by the EPA, approved the City's pretreatment program.  See Cal. Water Code §§ 13000-13001.  The City's permits, issued pursuant to the pretreatment ordinance and allowing industrial users to discharge pollutants into its POTW, establish the local limits specific to the user.

2.   Defendant Uniweb

Defendant Uniweb manufactures retail store fixtures at a facility in Corona, California.  (Def's Opp'n 5, April 7, 2008).  As part of its manufacturing operations, Uniweb cleans and rinses the steel it uses to make the store fixtures.  (Pl.'s Mem. P & A 2, March 31, 2008).  The wastewater generated through this process is

1   discharged into the City of Corona's POTW facility Number 2.

2   (Def.'s Opp'n 5).

3        Since 2001, the City of Corona has issued to Uniweb an annual

4   pretreatment permit that establishes "effluent limits" for specific

5   pollutants.  (Wastewater Discharge Permits 2001-2008, Pl.s' Exs. 3-

6   9.).[2]  These permits identify the maximum concentration of specific

7   types of pollution allowed per part of water.  (Pl.'s Exh. 3, 98-

8   100; Exh. 4, 112-14; Exh. 5, 126-28; Exh. 6, 142-44; Exh. 7, 158-

9   160; Exh. 8, 176-78; Exh. 9, 194-96.).  These permits also

10  establish a sampling frequency for each pollutant requiring that

11  Uniweb conduct routine water testing and report the results to the

12  City under penalty of perjury.  (Pl.s' Exhs. 3-9.)

13            3.   The City of Corona's Total Dissolved Solids Offset

14                 Program

15       On January 29, 2003, the City of Corona Department of Water

16  and Power addressed a letter to Uniweb and other industrial users

17  that announced the completion of a new water softening facility,

18  also called a desalter.  (Pl. Exh. 14 & Uniweb Exh. 101.)  The

19  letter provided that the City had received approval from the

20  Regional Board to operate an off-set program "to pass the salt

21  removal benefits to industrial users, providing that the City

22  fulfil its discharge obligation as outlined in the NPDES Permit."

23  (Id.)  The letter states:

24

25        _____

          [2] Effluent limits can be understood as the concentration level
26  of a specific type of pollution per part of water that a permit
    holder may discharge into a POTW.  For example, Defendant's 2001
27  permit indicates that Defendant may not discharge more than 332
    milligrams of sodium per liter of waste water.  (Pl's Exh. 3, 98-
28  100; Ex. 4, 112-14; Exh. 5, 126-28; Ex. 6, 142-44; Exh. 7, 158-160;
    Exh. 8, 176-78; Exh. 9, 194-96).

1        To implement this offset program, the City is proposing to

2        establish a surcharge fee for *total dissolved solids*,

3        considering that the *total dissolved solids* is the summation

4        of the *sodium*, *sulfate*, *chloride*, and *total hardness*.  Offset

5        benefits will apply to those individual mineral components as

6        well.  The surcharge fees collected will be used to assist

7        maintenance and future expansion of the City's Desalter.

8 (<u>Id.</u>)

9    The City considered eligible for the off-set program those

10 industrial users with flows less than 25 million GPD and TDS

11 concentrations of less than 4,800 mg/l.  Discharges over 850 mg/l

12 of TDS would be subject to a $ .05 surcharge fee per pound of TDS.

13 On July 29, 2004, according to the aforementioned terms, Uniweb and

14 the City entered an agreement for Uniweb's participation in the

15 off-set program.  (Pl. Exh. 15 & Uniweb Exh. 102.)   On July 1,

16 2008, the City plans to end the off-set program.

17            4.   <u>Plaintiff's Allegations and Uniweb's Defenses</u>

18    Plaintiff maintains that many wastewater samples taken by

19 Uniweb or the City between 2001 and 2007 exceeded the effluent

20 limits for sulfate, nickel, sodium and TDS that are set forth in

21 Uniweb's permit.  Specifically, Plaintiff alleges Uniweb exceeded

22 its permit limits for nickel on six occasions, for sodium on eight

23 occasions, for sulfate on thirteen occasions, and for TDS on eleven

24 occasions.  Plaintiff argues that each violative sample should

25 count not as a single violation, but as a violation for each day of

26 the sampling period, which would amount to 1,333 total violations

27 (515 for sulfate, 365 for nickel, 183 for sodium, and 270 for TDS).

28 Plaintiff additionally asserts that Uniweb may not rely on the off-

1   set program to avoid liability because the program was not enacted

2   pursuant to appropriate procedures under the Clean Water Act.

3        Uniweb raises several defenses based upon the TDS off-set

4   program.  The focus of these defenses are that the off-set program

5   increased Uniweb's discharge limits, such that the majority of its

6   alleged violations did not in fact violate the effluent limits as

7   modified by the off-set program.  Uniweb argues the off-set program

8   was in compliance with the Clean Water Act, and if it were not,

9   Plaintiff's complaint properly lies with the City.  Uniweb also

10  raises additional defenses: it argues that Plaintiff's pre-lawsuit

11  notice was inadequate; that Plaintiff's claims will become moot

12  upon the end of the off-set program on July 1, 2008; and that

13  Plaintiff does not have standing to challenge the violations that

14  occurred outside the scope of the off-set program because those

15  violations are not recurring or likely to recur.

16

17  **II.  LEGAL STANDARD**

18       Summary judgment is appropriate where "the pleadings, the

19  discovery and disclosure materials on file, and any affidavits show

20  that there is no genuine issue as to any material fact and that the

21  movant is entitled to a judgment as a matter of law."

22  Fed. R. Civ. P. 56(c).  In determining a motion for summary

23  judgment, all reasonable inferences from the evidence must be drawn

24  in favor of the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>,

25  477 U.S. 242, 255 (1986).  A genuine issue of material fact is

26  created if "the evidence is such that a reasonable jury could

27  return a verdict for the nonmoving party," and material facts are

28  those "that might affect the outcome of the suit under the

1  governing law." <u>Anderson</u>, 477 U.S. at 248.   On the other hand, no

2  genuine issue of fact exists "[w]here the record taken as a whole

3  could not lead a rational trier of fact to find for the non-moving

4  party." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475

5  U.S. 574, 587 (1986).

6

7  **III. DISCUSSION**

8      A.   <u>Plaintiff's Pre-Lawsuit Notice</u>

9      To file a "citizen" lawsuit under the Clean Water Act, the

10  plaintiff must first provide sixty days notice to the defendant.

11  33 U.S.C. § 1365(b).   Uniweb argues that Plaintiff's notice was

12  insufficient because there was "no reference to a challenge to the

13  validity of the Off-Set Program." (Opp'n 14.)   The Court

14  disagrees.

15      A plaintiff's notice need only provide "sufficient information

16  to permit the recipient to identify the specific standard,

17  limitation, or order alleged to constitute a violation."   40 C.F.R.

18  135.3(a).   The Ninth Circuit has recognized the pre-lawsuit notice

19  requirement as one of "reasonable specificity." <u>San Francisco</u>

20  <u>Baykeeper v. Tosco Corp.</u>, 309 F.3d 1153, 1158 (9th Cir. 2002).

21  There is no requirement "that plaintiffs list every specific aspect

22  of detail of every alleged violation." <u>Id.</u> (citations omitted).

23      Plaintiff has complied with that requirement here.[3]

24  Plaintiff sent a letter to Uniweb stating that it intended to bring

25  suit under the Clean Water Act.   Plaintiff explained that it

26

27      [3]There is no dispute that Plaintiff's October 31, 2006 letter

28  was sent more than sixty days before it filed suit on April 24, 2007.

1  believed Uniweb to have violated the Act by releasing wastewater in
2  excess of the limits set forth in Uniweb's discharge permits.
3  Plaintiff specifically cited to the Uniweb's wastewater discharge
4  permits.  (See Compl. Exh. A.)  Attached to the letter was a
5  document itemizing the alleged violations.  The document identified
6  the limits set forth in Uniweb's permits – not the off-set program
7  – as the standard for finding excess discharges of wastewater.  The
8  document also included calculations of the percentage of excess
9  over the permit limits.  (Id.)  The notice was reasonably specific
10 that Plaintiff would allege violations of Uniweb's permit limits.

11      Uniweb's suggestion that Plaintiff provided inadequate notice
12 is unconvincing.  The notice was "sufficiently specific to inform
13 [Uniweb] about what it [was allegedly] doing wrong, so that it
14 [knew] what corrective actions [would] avert a lawsuit."  ONRC
15 Action v. Columbia Plywood, Inc., 286 F.3d 1137, 1143 (9th Cir.
16 2002).  The clear inference to be drawn from Plaintiff's notice was
17 that it alleged violations of the permit limits and considered the
18 off-set program inapplicable.  Plaintiff did not need to
19 specifically cite to the off-set program to comply with the notice
20 requirement.  Cf. Waterkeepers Northern California v. AG Industrial
21 Mfg., 375 F.3d 913, 919 (9th Cir. 2004) (finding adequate notice
22 even in the absence of specific citation to applicable regulation).
23 Based upon the attachment to Plaintiff's notice, Uniweb must have
24 known that Plaintiff did not consider the off-set program to be the
25 applicable standard.  Accordingly, the Court finds that Plaintiff's
26 notice provided Uniweb with sufficient information of the basis for
27 its claim and complied with 40 C.F.R. 135.3(a).

28      B.   Uniweb's Effluent Limits

1  Whether Uniweb violated the Clean Water Act by exceeding local

2  pretreatment limits turns on this threshold question: was Uniweb

3  subject to the local effluent limits set forth in its discharge

4  permits or the modified limits specified in the TDS off-set

5  program.

6          1.    Modification of POTW Pretreatment Programs Under the

7                Clean Water Act

8  40 C.F.R. § 403.18 provides that "the Approval Authority or a

9  POTW . . . may initiate program modification. . . ."  40 C.F.R. §

10  403.18(a).  The regulation sets forth different procedures for

11  "substantial modifications" and "non-substanial modifications."  40

12  C.F.R. § 403.18(c-d).  Which procedures were applicable here

13  requires a determination whether Corona's TDS off-set program

14  qualified as a "substantial modification" or "non-substantial

15  modification."

16  The regulation defines "substantial modifications" in relevant

17  part as:

18        Modifications that relax local limits, except for the

19        modifications to local limits for pH and reallocations of the

20        Maximum Allowable Industrial Loading of a pollutant that do

21        not increase the total industrial loadings for the pollutant,

22        which are reported pursuant to paragraph (d) of this section.

23        Maximum Allowable Industrial Loading means the total mass of a

24        pollutant that all Industrial Users of a POTW . . . may

25        discharge pursuant to limits developed under § 403.5(c). . . .

26  40 C.F.R. § 403.18(b)(2).

27  Here, the off-set program sought to "relax local limits."  See

28  40 C.F.R. § 403.18(b)(2).  Local limits for purposes of the Clean

10

1  Water Act include the "specific effluent limits for Industrial
2  User(s)."   40 C.F.R. § 403.11(c) & (d).   The off-set program
3  increased TDS concentrations to 4,800 mg/l, and although it did not
4  specifically increase the sodium, sulfate, chloride, and total
5  hardness limits, it effectively relaxed those limits by including
6  those constituents in the program.  (See Pl. Exh. 14-15 & Uniweb
7  Exh. 101-102.)  Therefore, the Court finds that the off-set program
8  qualified as a "substantial modification."

9      Uniweb asserts that the off-set program did not relax local
10 limits, but only "reallocated the task of meeting a portion of the
11 TDS limits from Uniweb, and other businesses, to the City."  (Opp'n
12 20.)  Uniweb appears to base this argument on the regulation's
13 exception which provides that "reallocations of the Maximum
14 Allowable Industrial Loading [MAIL] of a pollutant" are not a
15 relaxation of local limits and thus not "substantial
16 modifications."  See 40 C.F.R. § 403.18(b)(2).  Plaintiff responds
17 that Uniweb's reliance on the exception is misplaced for two
18 reasons.  First, the increase of Uniweb and other industrial users'
19 discharge limits was not a mere reallocation.  Second, the
20 exception only applies to reallocations between industrial users,
21 not the type of reallocation between industrial users and the City
22 that was countenanced by the off-set program.

23     The Court finds that the off-set program increased the total
24 mass of a pollutant that industrial users could discharge into the
25 POTW, and therefore, did not constitute a "reallocation" of the
26 MAIL.  The off-set program allowed industrial users to increase
27 their pollutant discharges into the POTW with the City assuming
28 treatment responsibilities for those added discharges.  (See Pl.

Exh. 14 & Uniweb Exh. 101.)  While the program shifted

responsibility to the City,[4] the program was not the sort of

"reallocation" that falls within the regulation's exception.  The

regulation provides that a reallocation of the MAIL which increases

"the total industrial loadings for the pollutant" remains a

substantial modification.  40 C.F.R. § 403.18(b)(2).  As the off-

set program increased the amount of pollutants that industrial

users could discharge into the POTW, it did not fall within the

"reallocation" exception.  Whatever the reasons for adopting the

off-set program, the City was required to follow the approval

procedures for "substantial modifications" set forth at 40 C.F.R. §

403.18(c).

>    2.   Approval Procedures for Substantial Modifications to
>         POTW Pretreatment Programs

In seeking approval of substantial program modifications, the

POTW must submit a request to the Approval Authority that explains

the reasons for program modification.  40 C.F.R. § 403.18(c)(1).

The Approval Authority then reviews the program modification to

ensure that the POTW pretreatment program has legal authority to

regulate industrial users and enforce compliance with appropriate

pretreatment standards as required by law.  40 C.F.R. §

403.18(c)(2).  Additionally, the regulation requires compliance

with the public notice requirements of 40 C.F.R. § 403.11(b-f),

which include publication of the modification request in "a

---

[4]Uniweb also asserts that there was no relaxation of local
limits because the City still had to comply with its NPDES permit
under the off-set program.  However, while this may be true, the
fact that the off-set program relaxed the permit limits of
industrial users remains undisputed.  This fact makes the off-set
program a substantial modification.

1    newspaper(s) of general circulation" and set a notice period to

2    allow interested persons to comment on the modifications and

3    request a public hearing.  40 C.F.R. § 403.18(c)(2).  The Approval

4    Authority need not publish a notice of decision if the original

5    public notice of the requested modification indicates that "the

6    request will be approved if no comments are received by a date

7    specified in the notice; no substantive comments are received; and

8    the request is approved without change."  40 C.F.R. § 403.18(c)(3).

9    A POTW may comply with the public notice requirements so long as

10   the Approval Authority determines that the POTW's notice "satisfies

11   the requirements of § 403.11."  40 C.F.R. § 403.18(c)(4).

12        Plaintiff's counsel sets forth by declaration that several

13   public records requests were submitted to the City of Corona and

14   the Santa Ana Regional Water Quality Board in 2005 and 2006.

15   (Declaration of Cory J. Briggs ("Briggs Decl.") ¶ 3.)  Those

16   requests asked for documents related to the City's TDS off-set

17   program, and more generally, documents related to modification

18   requests by the City or modification approvals by the Board for

19   Corona's POTW pretreatment program.  (Pl.'s Exh. 16.)  In response

20   to those requests, Plaintiff's counsel reviewed files at the Board

21   twice in 2005.  Plaintiff's counsel also reviewed a number of City

22   documents copied by the City or counsel's staff.  Plaintiff's

23   counsel states that none of the documents reviewed at the Board's

24   offices or produced by the City showed any request for approval of

25   the TDS off-set program or any public notice of the requested

26   modification.  (Briggs Decl. ¶ 4.)

27        There is no documentary evidence that the City followed the

28   appropriate procedures for "substantial modifications" when

adopting the off-set program.  Plaintiff's review of files in connection with the public records requests did not uncover any record that the City sought approval for its modification or that public notice requirements were satisfied.[5]  (See Briggs Decl. ¶ 4.)  Uniweb does not provide documentary evidence to the contrary. Uniweb argues that triable issues of fact exist regarding whether the City followed appropriate procedures.  Uniweb points to the City's announcement of the off-set program and its letter of agreement with the City to participate in the off-set program.  In both, the City asserts that it "requested and received the Regional Board's approval."  (Uniweb's Exhs. 101 & 102.)  However, other than these assertions, there is no documentary evidence from the City or the Board to support that the off-set program was requested or approved.  Uniweb has not produced any documents or declarations from the City or the Board to show that approval was granted.[6] Moreover, there is no documentary evidence or even an assertion from the City that it complied with the requisite public notice requirements.  This is insufficient to create a triable issue of

---

[5]Uniweb objects that Plaintiff's counsel lacks personal knowledge to state whether the off-set program was approved or whether there was any record of approval.  Uniweb's objection is overruled because Plaintiff's counsel does not make any of those statements.  Rather, Plaintiff's counsel has personal knowledge of the results of his records request and research of produced documents.

[6]At oral argument, Uniweb maintained that the Board's  failure to act in approving the off-set program would result in approval of the program under the regulation.  This argument misreads the regulation.  For a non-substantial modification, the POTW may implement the modification if it does not receive a notice from the Approval Authority within 45 days of the Approval Authority's decision to approve or deny the modification.  40 C.F.R. § 403.18(d)(3).  For a substantial modification, however, a modification must be approved by the Approval Authority and satisfy various procedural requirements including public notice.  40 C.F.R. § 403.18(c).

1  fact.   See McCabe v. General Foods Corp., 811 F.2d 1336, 1340 (9th

2  Cir. 1987) (a party opposing summary judgment must present evidence

3  to create a triable issue of fact).

4       If there had been compliance with the 40 C.F.R. § 403.18(c)

5  procedures, the Board and the City would have maintained some

6  records of any requests for modification of Corona's POTW, any

7  review of such requests, or any public notice issued pursuant to

8  the procedures.   In the absence of evidence that the City complied

9  with the 40 C.F.R. § 403.18(c) procedures, the only reasonable

10  conclusion is that the TDS off-set program was adopted in

11  contravention of the procedures under the Clean Water Act

12  regulations.   Therefore, the off-set program's modifications to

13  industrial users' discharge limits were invalid because in

14  violation of the law.

15            3.   Uniweb's Effluent Limits Were the Limits Set Forth

16                 in its Discharge Permits

17       Because the off-set program was invalid, Uniweb and other

18  businesses in Corona were required to comply with the pollutant

19  discharge limits set forth in their discharge permits.   Whether

20  Uniweb has violated its effluent limits will be determined by

21  reference to the limits specified in its permit and not the invalid

22  modifications of the off-set program.   Thus, Uniweb's defenses

23  based on the off-set program are unavailing.

24       First, Uniweb cannot assert the "permit shield" defense

25  established under Section 402 of the Clean Water Act.   The defense

26  provides that "[c]ompliance with a permit issued pursuant to this

27  section shall be deemed compliance [with the Act]."   33 U.S.C.

28  1342(k).   However, Section 402 permits are the NPDES permits held

1 by cities operating POTWs, not the permits of industrial users that

2 discharge pollutants into the POTWs.  Industrial users such as

3 Uniweb are issued permits pursuant to section 307 of the Act, and

4 thus, Section 402's "permit shield" defense does not apply here.

5    Second, Uniweb's "pass through"[7] defense has been waived.

6 Uniweb did not raise a "pass through" defense in its answer to

7 Plaintiff's complaint.  See Uniweb's Answer, at 9-10.

8 The failure to allege an affirmative defense waives the defense.

9 Even if the Court construed Uniweb's answer to include this

10 defense, the "pass through" defense does not apply.  To prove the

11 "pass through" defense, an industrial user must show: (1) "[i]t did

12 not know or have reason to know that its Discharge, alone or in

13 conjunction with a discharge or discharges from other sources,

14 would cause Pass Through . . ."; and (2) compliance with "[a] local

15 limit designed to prevent Pass Through . . . directly prior to and

16 during the Pass Through . . ." 40 C.F.R. § 403.5(a)(2).[8]  There is

17 no evidence that a pass-through event occurred here.  In any event,

18 if a sample of wastewater shows that Uniweb did not exceed its

19 permit limits, then there is no violation for that sample.

20    Finally, Uniweb argues that its good faith participation in

21 the off-set program, even if the program was invalid, insulates it

22 from liability.  The Court disagrees.  All that is required to be

23

24    [7]As defined in the Clean Water Act regulations, "[t]he term
Pass Through means a Discharge which exits the POTW into waters of

25 the United States in quantities or concentrations which, alone or
in conjunction with a discharge or discharges from other sources,

26 is a cause of a violation of any requirement of the POTW's NPDES
permit (including an increase in the magnitude or duration of a

27 violation)." 40 C.F.R. § 403.3.

28    [8]There is also an alternative ground for the "pass through"
defense not raised here.  See 40 C.F.R. § 403.5(a)(2).

liable for a Clean Water Act violation is a discharge that exceeds the effluent limits specified in the industrial user's applicable discharge permit.  33 U.S.C. 1311(a) (prohibiting pollutant discharges "except in compliance with law," which includes the requirement that an industrial user comply with specific permit limits established under 33 U.S.C. 1317 and 40 C.F.R. 403.11). Compliance with the Clean Water Act is a matter of strict liability subject to the particular affirmative defenses set forth in the Act.  Cf. Hawaii's Thousand Friends v. City & County of Honolulu, 821 F. Supp. 1368, 1392 (D. Haw. 1993).

The Clean Water Act's strict liability regime for enforcing compliance with discharge limits supports holding Uniweb accountable for any violations of its permits in spite of any good faith reliance on the invalid off-set program.  That Uniweb may have inadvertently violated the permit limits in believing its discharges were lawful under the invalid off-set program does allow it to avoid a finding of liability, although this certainly could be a factor when measuring any civil penalties for violations. Hawaii's Thousand Friends, 821 F. Supp. at 1392, (citing United States v. Ohio Edison, 725 F. Supp. 928, 934 (N.D. Ohio 1989)) ("The fact that a violator is 'without fault' in committing violations of the Clean Water Act does not absolve the violator from penalties, although it may mitigate the amount of the penalties assessed."); see also 33 U.S.C. § 1319(d) (providing that a court in determining the extent of a civil penalty, shall consider the following six factors: "[t]he seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith

efforts to comply with the applicable requirements, the economic

impact of the penalty on the violator, and such other matters as

justice may require").

Moreover, there are significant public policy reasons for

rejection of Uniweb's good faith violations defense.  Where, as

here, the City did not comply with approval procedures for relaxing

industrial users' permit limits, the public was deprived of the

opportunity to make comments, oppose the measure, or request a

hearing.[9]  There are incentives for this approach.  Localities and

businesses may seek to enter side agreements as a way to circumvent

the approval process and the ever-present threat of public

opposition.  Yet the Clean Water Act's procedures prevent such

collusion.  Neither may a city unilaterally decide to modify its

POTW without the consent of the Approval Authority.  See 40 C.F.R.

§ 403.18(c).  Although there is no indication of collusion here, it

is inconsistent with the Clean Water Act's strict liability regime

to allow violators to avoid liability based upon its compliance

with an unauthorized or unnoticed city program.  Thus, Uniweb's

argument that Plaintiff may bring a claim against the City is

misplaced; rather, Uniweb may consider pursuing a claim against the

City for any penalties it may incur as a result of its

participation in the City's unlawful off-set program.  The Court

now turns to the violations.

---

[9]For this reason, Uniweb's laches defense also fails.  The failure to provide public notice of the off-set program explains why no lawsuit was filed until 2007.  Plaintiff cannot be faulted for lack of diligence in bringing this action.  See Kling v. Hallmark Cards Inc., 225 F.3d 1030, 1036 (9th Cir. 2000).

18

1         C.    <u>Violations of the Clean Water Act and Local Effluent</u>

2             <u>Limits</u>

3             1.    <u>Proof of Violations</u>

4       Plaintiff alleges a number of violations based upon the

5 sampling data in reports submitted by Uniweb to the City. Uniweb

6 argues that the monitoring reports show only a few, isolated Clean

7 Water Act violations and that its participation in the off-set

8 program eliminate Plaintiff's allegations of more significant

9 violations. Uniweb does not dispute that the monitoring reports

10 show discharges in excess of the permit limits.

11       A monitoring report that shows a water sample with pollutant

12 discharges in excess of permit limits is conclusive evidence of a

13 violation. <u>Sierra Club v. Union Oil Co.</u>, 813 F.2d 1480, 1491 (9th

14 Cir. 1987), <u>vacated on other grounds</u>, 485 U.S. 931 (1988),

15 <u>reinstated with minor amendment</u>, 853 F.2d 667 (9th Cir. 1988). A

16 defendant may not impeach its own publicly filed reports which are

17 "submitted under penalty of perjury." <u>Save Our Bays & Beaches v.</u>

18 <u>City & County Honolulu</u>, 904 F. Supp. 1098, 1138 (D. Haw. 1994).

19 Here, Corona requires industrial users like Uniweb to submit

20 monitoring reports under penalty of perjury. Corona Municipal Code

21 13.08.350 (providing that "[a]ll required reports" be submitted in

22 accordance with 40 C.F.R. 403.6(a)(2(ii), which states that reports

23 be submitted "under penalty of law"). Where Uniweb's reports

24 demonstrate discharges in excess of its permit limits, the Court

25 will consider that evidence to establish a violation.

26       The Court engages in an independent review of the monitoring

27 reports to determine whether there are in fact violations of a

28 permit. The Court has compared the discharges of nickel, sodium,

sulfate, and TDS on the alleged violation dates with Uniweb's applicable permit limits. The Court has synthesized the relevant data in the tables below,[10] and concludes that each of the following discharges were in violation of Uniweb's permits:

**VIOLATIONS[11]**

| Constituent | Permit Limit | Violation (Date) | Sample Frequency | No. Days Sample Period |
|---|---|---|---|---|
| Nickel | .4 mg/L | .45 mg/L (8-10-2005) | Biannually | 184 |
| Nickel | .4 mg/L | .42 mg/L (8-18-2005) | Biannually | Same Period |
| Nickel | .4 mg/L | .63 mg/L (9-13-2005) | Biannually | Same Period |
| Nickel | .4 mg/L | .41 mg/L (3-23-2006) | Biannually | 181 |
| Nickel | .4 mg/L | .41 mg/L (4-13-2006) | Biannually | Same Period |
| Nickel | .4 mg/L | .44 mg/L (4-24-2006) | Biannually | Same Period |

---

[10]Plaintiff provided tables to document Uniweb's violations in its moving papers for this motion. However, those tables were missing the reported discharge for each alleged violation. In future, Plaintiff should provide the reported discharge in excess of applicable permit limits in any table to assist the Court with its review of the monitoring reports.

[11]The Court has synthesized information from Uniweb's permits and monitoring reports in these tables. (<u>See</u> Pl.'s Exhs. 3-9, 17-36.)

| Constituent | Permit Limit | Violation (Date) | Sample Frequency | No. Days Sample Period |
|---|---|---|---|---|
| Sodium | 332 mg/L | 470 mg/L (9-12-2002) | Monthly | 30 |
| Sodium | 332 mg/L | 348 mg/L (7-14-2005) | Monthly | 31 |
| Sodium | 332 mg/L | 420 mg/L (8-10-2005) | Monthly | 31 |
| Sodium | 332 mg/L | 428 mg/L (8-18-2005) | Monthly | Same Period |
| Sodium | 332 mg/L | 510 mg/L (9-13-2005) | Monthly | 30 |
| Sodium | 332 mg/L | 374 mg/L (3-15-2006) | Monthly | 31 |
| Sodium | 332 mg/L | 390 mg/L (3-23-2006) | Monthly | Same Period |
| Sodium | 332 mg/L | 490 (4-13-2006) | Monthly | 30 |

| Constituent | Permit Limit | Violation (Date) | Sample Frequency | No. Days Sample Period |
|---|---|---|---|---|
| Sulfate | 300 mg/L | 386 (9-13-2005) | Monthly | 30 |
| Sulfate | 300 mg/L | 421 (2-15-2006) | Monthly | 28 |

21

| Sulfate | 300 mg/L | 481 (3-15-2006) | Monthly | 31 |
| Sulfate | 300 mg/L | 476 (4-13-2006) | Monthly | 30 |
| Sulfate | 300 mg/L | 825 (7-27-2006) | Monthly | 31 |
| Sulfate | 227 mg/L | 369 (1-12-2007) | Biannually | 181 |
| Sulfate | 227 mg/L | 297 (2-16-2007) | Biannually | Same Period |
| Sulfate | 227 mg/L | 324 (4-13-2007) | Biannually | Same Period |
| Sulfate | 227 mg/L | 342 (5-11-2007) | Biannually | Same Period |
| Sulfate | 227 mg/L | 316 (6-08-2007) | Biannually | Same Period |
| Sulfate | 227 mg/L | 305 (7-18-2007) | Biannually | 184 |
| Sulfate | 227 mg/L | 362 (8-17-2007) | Biannually | Same Period |
| Sulfate | 227 mg/L | 340 (9-18-2007) | Biannually | Same Period |

| Constituent | Permit Limit | Violation (Date) | Sample Frequency | No. Days Sample Period |
|---|---|---|---|---|
| TDS | 1,844 mg/L | 2200 mg/L (9-12-2002) | Monthly | 30 |

| | | | | |
|---|---|---|---|---|
| TDS | 1,844 mg/L | 1942 mg/L (2-10-2005) | Monthly | 28 |
| TDS | 1,844 mg/L | 2600 mg/L (07-14-2005) | Monthly | 31 |
| TDS | 1,844 mg/L | 2500 mg/L (8-10-2005) | Monthly | 31 |
| TDS | 1,844 mg/L | 2510 mg/L (8-18-2005) | Monthly | Same Period |
| TDS | 1,844 mg/L | 3220 mg/L (9-13-2005) | Monthly | 30 |
| TDS | 1,844 mg/L | 2400 mg/L (2-15-2006) | Monthly | 28 |
| TDS | 1,844 mg/L | 3850 mg/L (3-15-2006) | Monthly | 31 |
| TDS | 1,844 mg/L | 2200 mg/L (3-23-2006) | Monthly | Same Period |
| TDS | 1,844 mg/L | 4234 mg/L (4-13-2006) | Monthly | 30 |
| TDS | 1,556 mg/L | 2220 mg/L (7-27-2006) | Monthly | 31 |

2.   Number of Violations

A remaining issue is the number of violations.  Plaintiff argues that each day of a sampling period when a violation occurred should be counted as a distinct violation.  Applying this approach, Plaintiff calculates 1,333 total violations: 365 violations of nickel limits, 183 violations of sodium limits, 515 violations of

23

1 sulfate limits, and 270 violations of TDS limits.  Uniweb does not

2 address this issue.

3      Courts have found that "where a violation is defined in terms

4 of a time period longer than a day, the maximum penalty assessable

5 for that violation should be defined in terms of the number of days

6 in that time period."  Chesapeake Bay Found. v. Gwaltney of

7 Smithfield, 791 F.2d 304, 314 (4th Cir. 1986), vacated on other

8 grounds, Gwaltney v. Smithfield, Ltd., 484 U.S. 49 (1987); see also

9 United States v. Allegheny Ludlum Corp., 366 F.3d 164, 188 (3rd

10 Cir. 2004).  The Court accepts this proposition as a statement of

11 the law.  However, the Court   defers ruling on the precise number

12 of Uniweb's violations.  That issue is interrelated with the

13 Court's discretionary assessment of appropriate civil penalties.

14 See 33 U.S.C. § 1319(d).  The parties are yet to provide briefing

15 or evidence on civil penalties.  The Court, therefore, considers it

16 prudent to rule on the precise number of Uniweb's violations in

17 conjunction with its discretionary determination of the appropriate

18 civil penalties.

19      D.   Standing and Mootness

20      Uniweb argues that Plaintiff's lawsuit is moot because the

21 City has announced that the off-set program will be discontinued as

22 of July 1, 2008.  Uniweb also argues that Plaintiff lacks standing

23 because the violations are not recurring nor are they likely to

24 recur.[12]

25 ──────────────

26      [12]Uniweb does not argue that there has been no injury, no
causation, or that Plaintiff's claims would not redress the alleged
27 harm.  Nor does Uniweb challenge Plaintiff's "organizational
standing" as an environmental organization.  See Friends of the
28 Earth v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000). The
                                        (continued...)

1    The Clean Water Act contains a "citizen suit" provision that

2    confers standing to bring a civil action "against any person who is

3    alleged to be in violation of . . . an effluent standard or

4    limitation under th[e] Act. . . ."  33 U.S.C. § 1365(a); see also

5    Gwaltney, 484 U.S. at 58-61.  In Gwaltney, the U.S. Supreme Court

6    held that citizens bringing suit for Clean Water Act violations

7    "may seek civil penalties only in a suit brought to enjoin or

8    otherwise abate an ongoing violation."  Gwaltney, 484 U.S. at 59.

9    A plaintiff may show an ongoing violation "'either (1) by proving

10   violations that continue on or after the date the complaint is

11   filed, or (2) by adducing evidence from which a reasonable trier of

12   fact could find a continuing likelihood of a recurrence in

13   intermittent or sporadic violations.'"  Natural Resources Defense

14   Council v. Southwest Marine, Inc., 236 F.3d 985, 998 (9th Cir.

15   2000) (quoting Sierra Club v. Union Oil Co., 853 F.2d at 671

16   (quoting Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield,

17   Ltd., 844 F.2d 170, 171-72 (4th Cir. 1988))).

18       Here, there is evidence of ongoing sulfate violations since

19   Plaintiff filed its complaint in April 2007.  See supra 18-20.

20   Plaintiff argues that there is also evidence from which it is

21   reasonable to infer that intermittent or sporadic violations for

22   the other constituents are likely to recur.  The Ninth Circuit has

23   explained that "[i]ntermittent or sporadic violations do not cease

24   to be ongoing until the date when there is no real likelihood of

25   repetition."  Sierra Club, 853 F.2d at 671 (quoting Chesapeake Bay

26

27           [12](...continued)

28   Court notes that Uniweb's standing argument is limited to whether
     violations are likely to recur.

1  Found., Inc. v. Gwaltney of Smithfield, Ltd., 844 F.2d 170, 172

2  (4th Cir. 1988)).  Plaintiff indicates that Uniweb's operations

3  have not substantially changed during the period of its violations,

4  nor has Uniweb shown that the violations will not persist after the

5  off-set program.

6       As to sodium and TDS, the Court cannot conclude that there "is

7  no real likelihood of repetition" of violations under these

8  circumstances.  It is not clear that Uniweb will comply with its

9  permit limits independent of the off-set program.  As for the

10 nickel discharges in 2005 and 2006, Uniweb presents evidence that

11 it replaced filtration equipment after those excess nickel

12 discharges, and that there have been no excess nickel discharges

13 since that time.  (McDonnell Decl. ¶ 17; Uniweb Exh. 106.)  This is

14 enough to at least create an issue of fact whether nickel

15 discharges are likely to recur.  However, the Court does not

16 consider Uniweb's "best guess" that faulty filtration equipment was

17 the source of the excess nickel to preclude a reasonable trier of

18 fact from finding that nickel violations could recur.  (See Def.'s

19 Opp'n 9.)

20      The Court does not consider Plaintiff's claims moot because it

21 is not "absolutely clear" that Uniweb's violations will not recur

22 after the off-set program.  See Friends of the Earth, Inc., 528

23 U.S. at 189.  Uniweb presents its vice president's declaration,

24 where he states that Uniweb is "preparing for the end of the

25 Program and will have alternative arrangements in place when the

26 Program ends."  (Declaration of John McDonnell ¶ 26.)  While

27 McDonnell does offer tentative plans for compliance after the off-

28 set program, there is no concrete evidence that these plans will be

1  implemented or that implementation will prevent future violations.
2  Therefore, the Court finds that Plaintiff's claims are not moot.
3
4  **IV.   CONCLUSION**
5       For the foregoing reasons, the Court GRANTS the motion for
6  partial summary judgment.  The remaining issues in this case are
7  standing with respect to the nickel violations, the number of
8  violations, and proof of civil penalties.
9
10
11 IT IS SO ORDERED.
12
13
14 Dated: June 5, 2008                    _____
15                                        DEAN D. PREGERSON
                                          United States District Judge
16
17
18
19
20
21
22
23
24
25
26
27
28